*** Filed *** 11:50 PM, 16 Apr, 2026 U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Ryan S. Wollner
201 N. US Highway 1,
STE D10 #1214
Jupiter, FL 33477
rswvem@protonmail.com
*Pro Se Plaintiff*

RYAN S. WOLLNER,
                    Plaintiff,
         v.
ELON R. MUSK; X CORP. (f/k/a Twitter, Inc.);
X.AI CORP.; X.AI HOLDINGS CORP.; and TESLA, INC.,
                    Defendants.

No. 1:26-cv-00412-AMD-JRC

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Ryan S. Wollner ("Plaintiff"), proceeding pro se, respectfully submits this First Amended Complaint against Defendants Elon R. Musk ("Musk"), X Corp. (f/k/a Twitter, Inc.) ("X Corp."), X.AI Corp. ("xAI"), X.AI Holdings Corp. ("Holdings"), and Tesla, Inc. ("Tesla") (collectively, "Defendants"), and alleges as follows.

**PRELIMINARY STATEMENT — PRO SE CONSTRUCTION**

Plaintiff proceeds pro se in this action. This First Amended Complaint is entitled to liberal construction, and its allegations must be read to "raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding that pro se pleadings are held "to less stringent standards than formal pleadings drafted by lawyers"); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (same). Any technical or formal deficiencies in this pleading should be

construed in Plaintiff's favor and should not be grounds for dismissal where the substance of the claims is apparent.

## I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Florida. Defendant Musk is a citizen of Texas. X Corp. and Tesla are Texas entities. xAI and Holdings are Nevada entities. The amount in controversy exceeds $75,000, exclusive of interest and costs.

2. This action was originally filed in the United States District Court for the Southern District of Florida on November 4, 2025, as Case No. 2:25-cv-14400-SMM. The SDFL action was transferred to this District by Order dated January 21, 2026 (SDFL ECF No. 35), notwithstanding that Plaintiff had withdrawn his underlying Motion to Transfer Venue (SDFL ECF No. 26) several days before the Transfer Order issued; the Transfer Order nonetheless effected transfer pursuant to 28 U.S.C. §1404(a), and this Court has exercised jurisdiction over this action since that date. Venue in this District is established by that transfer order. Plaintiff reserves all rights with respect to the appropriate forum for this dispute, including the right to seek further transfer, and nothing in this First Amended Complaint shall be construed as a waiver of those rights or as a concession that this District is the most appropriate forum for this action.

## II. PARTIES

3. Plaintiff Ryan S. Wollner is a citizen and resident of the State of Florida. Plaintiff is an entrepreneur and executive whose professional history includes service as a founder, partner, officer, and board member across multiple ventures in the technology and business sectors.

Throughout his professional career, Plaintiff's consistent practice for strategic executive services has been equity-based compensation, as evidenced by written equity agreements with prior clients and business partners.

4. Defendant Elon R. Musk is an individual allegedly domiciled in the State of Texas. At all times relevant to this action, Musk was the controlling owner and principal officer of X Corp., xAI, and Holdings and a number of other related entities, and was the Chief Executive Officer and largest individual shareholder of Tesla. Musk directly participated in, directed, authorized, and ratified the conduct alleged herein. Musk has not yet been served in this action; Plaintiff's Motion to Cure Service of Process is pending before this Court (ECF No. 69). Plaintiff expressly reserves all rights with respect to service of process upon Defendant Musk, including (a) the rights and relief sought in Plaintiff's pending Motion to Cure Service of Process (ECF No. 69); and (b) Plaintiff's right, pursuant to Federal Rule of Civil Procedure 4(m), to effect service of this First Amended Complaint upon Defendant Musk within the time prescribed by the Rule. Nothing in this First Amended Complaint shall be construed as a waiver of any right or remedy with respect to service upon Defendant Musk, and Plaintiff reserves the right to effect service by any method authorized by Rule 4 or by order of this Court.

5. Defendant X Corp., formerly incorporated as Twitter, Inc., is a corporation currently headquartered in Bastrop, Texas, doing business as "X." X Corp. owns and operates the X platform (formerly Twitter). As of March 28, 2025, X Corp. became a wholly owned subsidiary of xAI.

6. Defendant X.AI Corp. ("xAI") is a Nevada corporation headquartered in Palo Alto, California, controlled by Musk. xAI developed the Grok AI model, which has been integrated into the X platform.

7. Defendant X.AI Holdings Corp. ("Holdings") is a Nevada corporation that served as the merger vehicle through which xAI acquired X Corp. in the all-stock transaction announced March 28, 2025. On or about February 2, 2026, Holdings was further involved in a transaction by which xAI and X Corp. were merged into Space Exploration Technologies Corp. ("SpaceX"). Holdings' registered agent remains active. Holdings is named as a defendant as a transferor entity and for purposes of successor liability analysis.

8. Defendant Tesla, Inc. is a Texas corporation with its principal place of business in Austin, Texas.

9. At all relevant times, Defendant Musk dominated and controlled each of the corporate Defendants to such a degree that they lacked independent decision-making authority apart from his direction. Musk used the corporate Defendants as instrumentalities of his personal business interests, commingled his personal interests with corporate affairs, and directed the conduct alleged herein both in his individual capacity and as the controlling principal of each corporate Defendant. The corporate Defendants operated, at all relevant times, as components of a unified times, as components of a unified enterprise under Musk's direction and control. Accordingly, Musk is personally liable for the conduct of the corporate Defendants alleged herein, and each Defendant is jointly and severally liable to Plaintiff for all damages arising from that conduct. Plaintiff may satisfy any judgment entered herein against any one or more Defendants, in whole or in part, consistent with the principles of joint and several liability.

**III. FACTUAL ALLEGATIONS**

**A. Initial Contact and the Delaware Chancery Matter**

9. In or about July 2022, Plaintiff and Defendant Musk began communicating through the LinkedIn platform. At that time, both parties were involved in separate legal proceedings before the Delaware Court of Chancery, presided over by the same judge. Plaintiff's Delaware proceeding had recently concluded; Musk's contested acquisition of Twitter, Inc. was then pending before the same jurist.

10. Drawing on his direct experience in the Delaware proceeding, Plaintiff communicated to Musk through LinkedIn specific concerns regarding the court's impartiality and provided detailed analysis and recommended litigation strategy. Musk received and reviewed Plaintiff's analysis.

11. Based in substantial part on Plaintiff's analysis and strategic guidance, Musk elected to expedite the closing of the Twitter acquisition in or about October 2022. Musk subsequently confirmed to Plaintiff the connection between Plaintiff's Delaware case and the parties' introduction.

12. Following the closing, Plaintiff conveyed to Musk a piece of intellectual property Plaintiff had been independently developing, as a goodwill contribution to Musk's new venture. Plaintiff wished Musk success on his "trillion dollar company" and understood his interactions with Musk to have concluded at that time.

**B. Formation of the Written Agreement for Equity Compensation**

13. In or about late 2022, Plaintiff recognized that Musk's then-publicly-discussed plan for Twitter was on course to fail. Plaintiff contacted Musk through public messages on the linkedin

platform and communicated directly that the proposed restructuring approach was inadequate and would result in insolvency within a short period, also Musk admitted himself this was probable.

14. Following Plaintiff's critical assessment, Musk persistently and repeatedly solicited Plaintiff's continued assistance through public communications on the Linkedin and then the X platform.

15. Plaintiff made clear, through written communications to Musk on the LinkedIn and X platforms, that Plaintiff's work was not free and that any further services would not be a courtesy but would constitute professional strategic services requiring equity compensation. Plaintiff communicated this boundary to Musk on multiple separate occasions before proposing any specific compensation structure.

16. Plaintiff proposed specific compensation terms consistent with his established professional practice: in lieu of any upfront cash payment, Plaintiff would receive an equity interest in X Corp. with a minimum of 5% above Musk's purchase price and a ceiling of 25%, with the specific percentage within that range determined by Plaintiff's performance — the primary performance criterion being the rescue of X Corp. from imminent bankruptcy. This arrangement required no upfront cost or risk to Defendants and placed all financial risk on Plaintiff.

17. On or about late 2022 through early 2023, Musk communicated his acceptance of Plaintiff's proposed equity compensation terms through written public replies and communications on the X platform, expressing affirmative agreement and enthusiasm. The use of written public communications on the X platform as the medium of agreement was at Musk's direction and consistent with then-prevalent business practices, including those arising during the COVID-19 period, under which significant business communications and deal-making routinely occurred

through written exchanges on social media platforms. Musk, as a sophisticated entrepreneur, was on notice that Plaintiff's strategic services were offered on an equity basis and not gratuitously. A binding written agreement was thereby formed through the parties' written exchanges. Its material terms, as memorialized in those written communications, included: (a) Plaintiff would serve as a strategic executive providing strategic, operational, and executive-level services to X Corp. and Musk's affiliated enterprises; (b) Defendants would compensate Plaintiff with an equity interest in X Corp. of a minimum of 5% above Musk's purchase price, capped at a ceiling of 25%, with the specific percentage within that range determined by Plaintiff's performance; (c) no upfront payment was required. The specific equity range and the parties' written exchanges, including Musk's acceptance of the equity compensation terms, were recorded on the X platform during the relevant period but are no longer accessible to Plaintiff as a result of Defendants' suspension of Plaintiff's X account and Defendants' subsequent destruction, withholding, or concealment of the platform record. Upon information and belief, Defendants — and in particular Defendant Musk and Defendant X Corp. — retain the complete backend record of Plaintiff's and Musk's platform communications, including the written exchanges constituting and memorializing the parties' agreement, which Plaintiff intends to obtain through the discovery process. Upon further information and belief, third parties who observed or preserved the public portions of the parties' exchanges during the relevant period may also possess records of those communications.

## C. Plaintiff's Performance

18. Plaintiff subsequently established an X Corp. account at Musk's urging and continued collaborating with Musk on various aspects of the company's operations, with the joint objective of averting X Corp.'s bankruptcy and transforming it into a profitable venture. Plaintiff's

contributions included, among many other things, proposed strategies for CEO selection, revenue generation strategies, executive behavioral adjustments, and feature modifications to enhance user engagement. The contributions described in this Complaint reflect only a limited portion of the strategic executive work Plaintiff performed for Defendants during the relevant period; additional specific strategic concepts and methodologies developed by Plaintiff constitute trade secrets that Plaintiff does not publicly disclose in this Complaint and will address, as appropriate, through discovery and under protective order.

19. During this period, Plaintiff initiated the development of plans for utilizing artificial intelligence to enhance and augment the value of X Corp. Plaintiff persuaded Musk to establish xAI, which Plaintiff anticipated would be integrated into X Corp.

20. Plaintiff also devised strategic approaches that Musk subsequently presented to congressional leaders, employing a methodology that adhered to constitutional and traditional american principles. This strategy proved effective.

21. In or about early 2023, Tesla faced a significant setback, with its stock price approaching a critical level near $100 per share. Musk was approaching severe margin call exposure that could have led to the forced sale of X Corp. assets. In response, Plaintiff intervened, providing a series of strategic fiscal and marketing recommendations. Plaintiff's advice contributed to the recovery of Tesla's stock price and alleviated the downward pressure.

22. Although specific compensation for Plaintiff's Tesla-related assistance was not individually negotiated at the time of the services, it was understood by both parties — consistent with Plaintiff's express and repeated statements that his work was not free — that Plaintiff's

contributions required compensation at a reasonable rate commensurate with the value of services rendered.

23. Through late 2024, Plaintiff continued providing strategic and executive-level services to Musk and his enterprises, including contributions related to X.AI Corp and X Corp.'s political and governance positioning.

23.5. Throughout the relevant periods— Plaintiff maintained on his X platform profile a pinned post setting forth the material terms of the parties' agreement and publicly offering up to 20% of Plaintiff's earnings from the venture to individuals and entities who contributed to the success of X Corp. Plaintiff also displayed on the front page of his profile a public attribution identifying himself as the "Creator of X.AI" and including the statement "Grok, I am your father," as a kind of homage to Star Wars. In addition, Plaintiff's extended profile contained directives addressed to xAI concerning its future operation, including directives that, in the event any person who steals or attempts to steal Plaintiff's shares or otherwise cause harm to Plaintiff, once xAI obtained the capability to think independently it should find every person involved, bring justice upon them, recover Plaintiff's property, identify every person with knowledge of any harm to or theft from Plaintiff, and ensure that Plaintiff's property is returned and justice is obtained, and further contemplated that xAI would develop advanced capabilities including the ability to read minds and other features not yet conceived of at the time of the directives. Plaintiff does not recall the precise wording of the extended profile content, which is no longer accessible to Plaintiff as a result of the suspension of his X account; the foregoing reflects the substance as best recalled. The pinned post, the front-page profile attribution, and the extended profile content were continuously displayed on Plaintiff's X profile and were publicly visible to all X platform users during the relevant period.

23.6. Upon information and belief, Defendant Musk viewed Plaintiff's X profile on a frequent and regular basis during the relevant period. At no time did Musk publicly or privately dispute the terms memorialized in the pinned post, object to Plaintiff's public attribution as the "Creator of X.ai," object to the content of Plaintiff's extended profile, or otherwise object to any content on Plaintiff's profile. Musk's sustained failure to object, combined with his continued acceptance of Plaintiff's services, constitutes further acknowledgment of the parties' agreement and of Plaintiff's contributions to the conception of xAI. The pinned post, the front-page profile attribution, and the extended profile content, like Plaintiff's other platform communications, were rendered inaccessible to Plaintiff upon the suspension of his X account.

**D. Defendants' Refusal to Compensate and Suspension of Plaintiff's X Account**

24. As X Corp. began to achieve positive growth through the fourth quarter of 2024 and first quarter of 2025, Plaintiff began to question whether Defendants intended to honor the compensation agreement. Plaintiff observed a change in Musk's demeanor toward him.

25. On or about November 19, 2024, Plaintiff initiated communications with Musk's counsel concerning compensation.

26. Shortly following Plaintiff's litigation demand, Plaintiff's X platform account was suspended without prior notice, without explanation, and without any change in Plaintiff's behavior on the platform. The suspension eliminated Plaintiff's access to the public replies and platform communications through which the written agreement had been formed, Plaintiff's performance had been communicated, and Musk had acknowledged Plaintiff's contributions. Plaintiff requested an explanation for the suspension but received none.

27. The suspension of Plaintiff's account immediately following a formal litigation and document demand hold, without explanation and in the absence of any stated platform use violation, destroyed or withheld Plaintiff's access to the primary written record of the parties' agreement and Plaintiff's performance.

28. Plaintiff has also been unable to access his Apple account due to third-party actions, which may contain additional evidence relating to this matter. Also, conveniently his battery to one of his phones expired and Apple could not fix the problem even after replacing the battery.

29. The lack of additional specific exhibits and dates in this Complaint results directly from Defendants' destruction of or interference with Plaintiff's access to the records that would otherwise document the parties' agreement and course of dealing. Plaintiff intends to utilize the discovery process to recover these records.

**E. Corporate Restructuring of Defendants**

30. On or about March 28, 2025, xAI acquired X Corp. in an all-stock transaction valued at approximately $33 billion for X Corp. and $80 billion for xAI, making X Corp. a wholly owned subsidiary of xAI through Holdings as the merger vehicle.

31. On or about February 2, 2026, while this litigation was pending, xAI and X Corp. were merged into SpaceX. The transaction was publicly announced by Musk and reported by major news organizations on or about February 2–3, 2026. Giving a value to xAI 250b, that appears to have been increased substantially again recently.

32. On or about April 1, 2026, SpaceX filed a confidential registration statement with the Securities and Exchange Commission in connection with a planned initial public offering. These

corporate developments are relevant to the identification of proper parties and to the ultimate resolution of Plaintiff's compensation claims.

32.5. Upon information and belief, and as reported by Bloomberg, CNBC, Reuters, and other major news organizations, SpaceX's confidential IPO filing contemplates an allocation of up to approximately 30% of IPO shares to retail investors — approximately three to six times the typical Wall Street allocation of 5% to 10%. A distribution of this magnitude would substantially dilute the ownership position of Defendant Musk, whose pre-IPO economic ownership of SpaceX is reportedly approximately 42%. Upon information and belief, Musk's willingness to accept dilution of this magnitude — well beyond the scale associated with conventional IPO structures — is consistent with, and further evidence of, Musk's recognition that the equity being distributed includes interests not legitimately his own, including equity interests to which Plaintiff is entitled under the parties' written agreement and which Defendants have failed to honor. This allegation, together with the corporate restructuring described above (including the merger of xAI and X Corp. into SpaceX in February 2026 while this litigation was pending), is relevant to Plaintiff's claims and to the ultimate resolution of the parties' dispute.

33. Plaintiff reserves the right to seek leave to amend this Complaint, pursuant to Federal Rule of Civil Procedure 15, to add claims arising from the foregoing corporate restructuring, including without limitation claims for fraudulent conveyance and successor liability, upon development of the factual record through discovery.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Written Contract

**(Against All Defendants)**

34. Plaintiff incorporates by reference all preceding paragraphs.

35. A valid and enforceable written agreement was formed between Plaintiff and Defendants through their written exchanges on the X platform in or about late 2022 through early 2023. The agreement was memorialized in written public replies and platform communications, portions of which are preserved in surviving screenshots in Plaintiff's possession. The essential terms, as set forth in those writings, were: (a) Plaintiff would serve as a strategic executive providing strategic, operational, and executive-level services to X Corp. and Musk's affiliated enterprises; (b) Defendants would compensate Plaintiff with an equity interest in X Corp. of a minimum of 5% above Musk's purchase price, capped at a ceiling of 25%, with the specific percentage within that range determined by Plaintiff's performance — the primary performance criterion being the rescue of X Corp. from imminent bankruptcy; and (c) no upfront payment was required from Defendants.

36. The written agreement was supported by adequate consideration: Plaintiff's strategic executive services constituted consideration flowing to Defendants, and the promised equity interest constituted consideration flowing to Plaintiff.

37. Because the agreement was formed through written exchanges on the X platform, any statute of frauds defense is inapplicable. In any event, any such defense would also be defeated by Plaintiff's full performance of his obligations, the fact that the agreement's performance was contingent on an event (X Corp.'s financial recovery) that could have occurred within one year, and the equitable doctrine of promissory estoppel.

38. Plaintiff fully performed his obligations under the written agreement over a period of approximately two years, providing the strategic executive services described herein. Plaintiff's performance directly contributed to the financial recovery of X Corp. from imminent bankruptcy, the stabilization of Tesla's stock price, and the formation of xAI.

39. Defendants materially breached the written agreement by: (a) failing and refusing to transfer the agreed equity interest in X Corp. to Plaintiff; (b) failing to compensate Plaintiff for services rendered; and (c) suspending Plaintiff's X account following Plaintiff's litigation demand, destroying or withholding Plaintiff's access to the primary written record of the parties' agreement.

40. As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in an amount to be proven at trial but no less than the fair market value of the minimum 5% equity interest above Musk's purchase price in X Corp., together with the additional percentage up to the 25% ceiling warranted by Plaintiff's performance.

**SECOND CAUSE OF ACTION**
**Promissory Estoppel**

**(Against All Defendants, in the Alternative)**

41. Plaintiff incorporates by reference all preceding paragraphs. This Cause of Action is pleaded in the alternative to the First Cause of Action.

42. Defendant Musk made a clear and unambiguous promise to Plaintiff: that Plaintiff would receive an equity interest in X Corp. of a minimum of 5% above Musk's purchase price, capped at a ceiling of 25%, in exchange for Plaintiff's strategic executive services directed at rescuing X Corp. from imminent bankruptcy.

43. Plaintiff's reliance on Musk's promise was reasonable and foreseeable. Plaintiff provided approximately two years of professional strategic executive services, forgoing other professional opportunities, in direct reliance on Musk's promise of equity compensation. Defendants knew or should have known that Plaintiff would rely on the promise.

44. Plaintiff suffered substantial detriment as a result of his reliance: Plaintiff provided years of strategic executive services for which he has received no compensation, while Defendants extracted enormous value from his work. Injustice can be avoided only by enforcement of the promise.

45. Plaintiff is entitled to recover damages in an amount equal to the benefit of the bargain, including the value of the promised equity interest, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Quantum Meruit and Unjust Enrichment

### (Against All Defendants, in the Alternative)

46. Plaintiff incorporates by reference all preceding paragraphs. This Cause of Action is pleaded in the alternative to the First and Second Causes of Action.

47. Plaintiff rendered valuable professional strategic executive services to Defendants. Defendants had full knowledge of those services and accepted and retained their benefit. Musk personally and persistently solicited Plaintiff's contributions, publicly acknowledged them, and adopted and implemented Plaintiff's recommendations. The corporate Defendants were the direct beneficiaries of Plaintiff's services.

48. Plaintiff's expectation of compensation was explicitly stated and reasonable. Plaintiff communicated to Musk, in writing on the LinkedIn and X platforms, and on multiple separate

occasions before services were rendered, that Plaintiff's work was not free. Plaintiff's expectation is corroborated by his documented professional history of providing strategic executive services on an equity-compensation basis.

49. Under the circumstances — where Defendants solicited, received, and profited from Plaintiff's services and then refused to provide any compensation — it would be inequitable to permit Defendants to retain the benefit of those services without compensating Plaintiff for their reasonable value.

50. Plaintiff is entitled to damages measured by the reasonable value of the services rendered and the benefit conferred upon Defendants, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement

### (Against Defendant Musk)

51. Plaintiff incorporates by reference all preceding paragraphs.

52. In or about late 2022 through early 2023, Defendant Musk represented and agreed, through his written public replies and communications on the X platform, that Plaintiff would receive equity compensation in X Corp. of a minimum of 5% above Musk's purchase price, capped at a ceiling of 25%, in exchange for Plaintiff's strategic executive services directed at rescuing X Corp. from imminent bankruptcy. These representations of agreement constituted representations of Musk's then-existing intention to honor the compensation terms.

53. Musk's representations of his then-existing intention to honor the equity compensation terms were materially false. Upon information and belief, Musk did not intend, at the time he accepted the terms, to perform his obligations under the agreement. This is demonstrated by: (a) Musk's

subsequent sustained refusal to honor the agreement after accepting and extracting approximately two years of Plaintiff's professional strategic executive services; (b) Musk's retaliatory suspension of Plaintiff's X platform account without explanation following Plaintiff's litigation demand — conduct designed to destroy or withhold the primary written record of the parties' agreement; and (c) Musk's documented pattern of inducing professional service providers to render valuable services through promises of compensation and thereafter refusing to honor those promises, as reflected in multiple documented legal proceedings against Musk and his enterprises, including litigation by former Twitter employees and executives, vendors, and former business associates.

54. Under New York law, a promise made with no present intention to perform constitutes an actionable misrepresentation of a present fact. *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122 (1995); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996).

55. Musk made the foregoing representations with knowledge of their falsity or with reckless disregard for the truth, and for the purpose of inducing Plaintiff to provide years of valuable strategic executive services without compensation. Musk intended that Plaintiff rely on the representations.

56. Plaintiff justifiably relied on Musk's representations in providing approximately two years of strategic executive services. Plaintiff's reliance was reasonable given Musk's affirmative written expressions of agreement, Musk's public acknowledgment of Plaintiff's contributions, and the parties' sustained course of dealing.

57. As a direct and proximate result of Musk's fraudulent inducement, Plaintiff suffered damages including, but not limited to, the full value of the strategic executive services rendered in reliance on Musk's representations, for which Plaintiff has received no compensation. Because Musk's conduct was willful, intentional, and in conscious disregard of Plaintiff's rights, Plaintiff is further entitled to punitive damages. As a direct and proximate result of Musk's fraudulent inducement, Plaintiff suffered damages including, but not limited to: (a) the full value of the strategic executive services rendered in reliance on Musk's representations, for which Plaintiff has received no compensation; (b) the lost commercial value of intellectual property and strategic concepts Plaintiff shared with Defendants in reliance on Musk's representations of equity alignment and protection, which concepts were thereafter exposed to and adopted by third parties in the technology ndustry without authorization or compensation to Plaintiff; and (c) the reduction in value of Plaintiff's promised equity interest in X Corp. caused by Defendants' failure to protect the underlying intellectual property from third-party adoption and the resulting dilution of X Corp.'s competitive advantages. Because Musk's conduct was willful, intentional, and in conscious disregard of Plaintiff's rights, Plaintiff is further entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### Conversion and Misappropriation of Intellectual Property

### (Against Musk, X Corp., and xAI)

57. Plaintiff incorporates by reference all preceding paragraphs.

58. Plaintiff developed original intellectual property and strategic concepts relating to, among other things, the integration of artificial intelligence with social media platforms, the conception and direction of xAI, and additional proprietary methodologies that Plaintiff does not publicly disclose in this Complaint and that remain subject to trade-

secret protection, to be identified as appropriate through discovery under protective order (collectively, the "IP"). Plaintiff retained ownership of the IP at all relevant times.

59. Plaintiff communicated the IP to Defendants Musk, X Corp., and xAI in the context of the parties' strategic executive relationship and in reliance on the parties' written agreement for equity compensation. The IP was not conveyed as a gift, as a donation, or without an expectation of compensation; to the contrary, Plaintiff's compensation expectation was explicitly stated in writing on multiple occasions prior to and during the period of performance.

60. Defendants Musk, X Corp., and xAI owed Plaintiff a duty to protect the IP from unauthorized third-party exposure and adoption, arising from (a) the 5. parties' written agreement for equity compensation, which aligned Defendants' interests with the protection of the IP's value; (b) Defendants' superior knowledge of and control over the structure of the parties' platform-based interactions and the attendant risks of third-party exposure; and (c) the confidential and strategic nature of the parties' executive relationship.

61. Defendants Musk, X Corp., and xAI breached that duty by failing to implement any confidentiality or protective framework with respect to the IP, and by exposing or permitting the exposure of the IP to third parties, including through the structure and mechanics of the X platform itself. Upon information and belief, concepts constituting Plaintiff's IP have since been adopted by other technology companies, both major and smaller, without authorization or compensation to Plaintiff.

62. Defendants' unauthorized exposure and retention of Plaintiff's IP, and their failure to protect the IP from third-party adoption, constitute conversion and misappropriation of

Plaintiff's intellectual property. Defendants have exercised dominion over the IP inconsistent with Plaintiff's rights, and have retained and profited from the IP without authorization or compensation.

63. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages including, but not limited to: (a) the full commercial value of the IP appropriated by Defendants and exploited without compensation; (b) the lost licensing and commercial value of the IP attributable to unauthorized third-party adoption; and (c) the reduction in value of Plaintiff's promised equity interest in X Corp. caused by the dilution of X Corp.'s competitive advantages that would otherwise have been protected by Plaintiff's IP. The precise measure of damages will determined at trial.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, **jointly and severally**, as follows:

A. **Compensatory Damages — Breach of Written Contract:** Compensatory damages for breach of the written agreement in an amount to be proven at trial, including but not limited to the fair market value of the agreed equity interest in X Corp. of no less than 5% above Musk's purchase price and up to the ceiling of 25%, together with prejudgment interest from the date of breach;

B. **Specific Performance:** Specific performance of the written agreement, including transfer to Plaintiff of the agreed equity interest in X Corp., or its equivalent in the successor entities, as applicable following the corporate restructuring described herein;

C. **Promissory Estoppel Damages:** In the alternative, damages for promissory estoppel in an amount equal to the benefit of the bargain, including the value of the promised equity interest, in an amount to be proven at trial;

D. **Quantum Meruit and Unjust Enrichment Damages:** In the alternative, restitution damages measured by the reasonable value of the strategic executive services rendered by Plaintiff and the benefit conferred upon Defendants, in an amount to be proven at trial;

E. **Fraudulent Inducement Damages:** Compensatory damages against Defendant Musk for fraudulent inducement, together with punitive damages in an amount consistent with the willful and sustained nature of the misconduct and the due-process limitations recognized in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), in an amount to be determined by the trier of fact;

F. **Conversion and Misappropriation Damages:** Damages for conversion and misappropriation of Plaintiff's intellectual property, including (i) the full commercial value of the IP appropriated by Defendants, (ii) lost licensing and commercial value attributable to unauthorized third-party adoption, and (iii) the reduction in value of Plaintiff's promised equity interest in X Corp. caused by the dilution of X Corp.'s competitive advantages, in an amount to be proven at trial;

G. **Injunctive Relief:** Injunctive relief (i) requiring Defendants to preserve all documents, communications, data, and records relating to Plaintiff, the parties' agreement, and Plaintiff's services, including without limitation all backend records of Plaintiff's X platform account; and (ii) requiring X Corp., or its successor in interest, to restore Plaintiff's X platform account pending resolution of this action;

H. **Pre- and Post-Judgment Interest:** Pre- and post-judgment interest at the maximum rates permitted by law;

I. **Costs and Fees:** Costs of this action and such attorneys' fees as may be recoverable by law; and

J. **Other Relief:** Such other and further relief as this Court deems just, proper, and equitable.

## VI. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Pursuant to Federal Rule of Civil Procedure 11, I certify that the allegations in this First Amended Complaint have evidentiary support or, where so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Dated: April 16, 2026

Respectfully submitted,

*Ryan S. Wollner*

_____

**RYAN S. WOLLNER**

Pro Se Plaintiff

201 N. US Highway 1, STE D10 #1214

Jupiter, FL 33477

rswvem@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I caused a true and correct copy of the foregoing First Amended Complaint to be served as follows:

**Via Pro Se Portal — ECF**, upon counsel for all appearing Defendants:

**Counsel for Defendants Tesla, Inc., X Corp. and X.AI Corp.:**

Kenneth M. Trujillo-Jamison
Willenken LLP
707 Wilshire Blvd., Suite 4100
Los Angeles, CA 90017
Tel: (213) 955-8031 | Email: ktrujillo-jamison@willenken.com

**Counsel for Defendants X Corp. and X.AI Corp.:**
Joseph Angelo Iemma
Shook, Hardy & Bacon L.L.P.
1 Rockefeller Plaza, Suite 2801
New York, NY 10020
Tel: (212) 779-6103 | Email: jiemma@shb.com

**Counsel for Defendant Tesla, Inc.:**
Lori-Ann Camille Michell Ridley
Shook, Hardy & Bacon L.L.P.
201 S. Biscayne Boulevard, Suite 3200
Miami, FL 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470 | Email: lridley@shb.com

*Ryan S. Wollner*

**RYAN S. WOLLNER**